## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ALEXANDRIA SCAFIDI (Petitioner on Immigrant Visa Petition filed on behalf of MUHAMMAD HAMZA AHMAD) | : <br> : <br> : <br> : |
| Plaintiff | : |
| **v.** | : **A213-606-169** |
| | : |
| TODD BLANCHE, Acting Attorney General of the United States, MARKWAYNE MULLIN, Secretary of the Department of Homeland Security (DHS), JOSEPH EDLOW, Director of U.S. Citizenship and Immigration Services (USCIS), BRETT RINEHART, District Director of USCIS Miami, Florida | : <br> : <br> : <br> : <br> : <br> : **ACTION FOR** |
| | : |
| | : **DECLARATORY JUDGMENT** |
| in their official capacities, | : |
| | : |
| Defendants | : |
| | : |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This is an individual action for Declaratory Judgment authorized by 28 U.S.C. §1331, Federal Question Jurisdiction, 28 U.S.C. §2001, The Declaratory Judgment Act and the Administrative Procedure Act, 5 U.S.C. §702. The scope of review as provided in 5 U.S.C. §706, stated in relevant part is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

### JURISDICTION

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 (Federal Question Jurisdiction) and 28 U.S.C. §2201 (Declaratory Judgment Act), as Plaintiff's claims arise under the laws of the United States, particularly *The Homeland Security Act of 2002*,

Pub. Law No. 107-296 (Nov. 25, 2002), as amended by Pub. Law No. 108-7, § 105 (Feb. 20, 2003), 8 U.S.C. §§ 1103, 1105, 1255, and related agency regulations and 5 U.S.C. §702 et. seq.

2. This action challenges the non-discretionary determination of Plaintiff to approve or deny an immigrant visa petition filed on behalf of an immediate relative (spouse). 8 U.S.C. §1154(b).

3. Petitioner has exhausted her administrative remedies. 8 CFR §1003.1(b)(5). *See Darby v. Cisneros*, 509 US 137 (1993) (Federal courts do not have the authority to require a plaintiff to exhaust available administrative remedies before seeking judicial review under the APA, where neither the relevant statute nor agency rules specifically mandate exhaustion as a prerequisite to judicial review).

4. The jurisdictional limitations under 5 U.S.C. §701(a)(2) and 8 U.S.C. §1252 do not apply. Pursuant to the Immigration and Nationality Act, 8 U.S.C. §1154(b), a USCIS decision on the adjudication of an immediate relative immigrant visa petition for which declaratory judgment is sought is not a discretionary determination.

### VENUE

5. Venue in this District is proper under 28 U.S.C. §1391 because the Miami office of the U.S. Citizenship and Immigration Services ("USCIS") has the jurisdiction to adjudicate the Petitioner's visa petition filed on behalf of her spouse. Petitioner resides at 335 South Biscayne Blvd, Apt #1502, Miami, Florida 33131.

### PARTIES

6. Plaintiff, Alexandria Scafidi, ("Alexandria") is a 29-year-old United States citizen. She is a Radiation Therapist. She married Beneficiary, Muhammad Hamza Ahmad, on May 23, 2024.

7. Defendant, Todd Blanche, is the Acting Attorney General of the United States, whose office address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530.

**8.** Defendant, Markwayne Mullin, is the Secretary of the Department of Homeland Security, whose office address is 2707 Martin Luther King Jr. Ave., SE, Washington, DC 20528.

**9.** Defendant, Joseph Edlow, is the Director of USCIS, whose office address is USCIS, 5900 Capital Gateway Drive Camp Springs, Maryland 20588.

**10.** Defendant, Brett Rinehart is the District Director of USCIS in Miami, Florida, which is the USCIS office that has jurisdiction over Plaintiff's Alien Relative Petition and Application for Permanent Residence. His office address is 8801 NW 7th Ave, Miami, Florida 33150.

**11.** Each Defendant is sued in his or her official capacity. Defendants are responsible for the adjudication of Plaintiff's petition.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

**12.** No exhaustion of remedy requirements applies to the Plaintiff's complaint petition/application.

**FACTUAL ALLEGATIONS**

**13.** The I-130 Petitioner, Alexandria, married the I-130 Beneficiary, Muhammad Hamza Ahmad (Muhammad) on May 23, 2024. Muhammad is a 29-year-old native and citizen of Pakistan.

**14.** On June 25, 2024, Alexandria filed form I-130, Petition for Alien Relative with USCIS. With this petition, Muhammad filed form I-485, Application for Adjustment of Status to Permanent Resident. **EXHIBIT 1** (Copy of Alexandria's Visa Petition and Muhammad's Application for Adjustment of Status and exhibits attached thereto).

**15.** This was the second I-130, Immigrant Visa Petition filed on behalf of Muhammad. Muhammad had been previously married to Tayyaba Khan (Tayyaba). This was a traditional Muslim arranged marriage by Tayyaba and Muhammad's parents. On November 17, 2021, Tayyaba filed a visa petition on behalf of Muhammad.  On March 14, 2024, her visa petition was denied. **EXHIBIT 2** (Form I-130 submitted by Tayyaba and the related Form I-485 submitted by Muhammad.

Undersigned counsel did not represent Muhammad and Tayyaba in their filings, therefore, no copies of the supporting documents related to those submissions are being presented herein, as Counsel only has access to the very same documents included in this exhibit. Nevertheless, USCIS has a complete record of the filings). Muhammad filed for annulment of his marriage with Tayyaba on July 1, 2022, as he had decided not to go through with the final step of the traditional Muslim wedding ceremony, the Rukhsati, realizing that he did not want to spend the rest of his life with Tayyaba. Since the Rukhsati had not been performed, the marriage was never consummated (in a traditionally conservative Muslim marriage, couples are only allowed to live in marital union and engage in intimacy after the Rukhsati)[1].

**16.** Muhammad presented an affidavit with the petition filed by his second wife, Alexandria, explaining the circumstances of his marriage to Tayyaba. **EXHIBIT 3** (Affidavit filed by Muhammad, also summarized below). Muhammad filed the affidavit with substantial evidence that his marriage to Tayyaba was bona fide, as 8 USC §1154(c) bars a visa petition from being approved if the beneficiary entered into or conspired to enter into a fraudulent marriage to evade immigration laws. This evidence includes a plethora of plane tickets to Alabama evidencing that Muhammad frequently visited his wife, photos of various Muslim ceremonies between Muhammad and Tayyaba, photos of Tayyaba's family meeting Muhammad's family in Pakistan to celebrate the engagement, and emotional text messages between Tayyaba and Muhammad when he advised that he would not go through with the Rukhsati. In spite of the abundance of evidence demonstrating the bona fides of his marriage to Tayyaba, On May 1, 2026, USCIS denied Alexandria's petition filed on Muhammad's behalf, finding that his earlier marriage to Tayyaba

---

[1] https://www.findloveia.com/blog/arranged-marriage-in-islam (for an explanation of the Muslim marriage culture.)

was fraudulent. **EXHIBIT 4** (Denial of Visa Petition filed by Alexandria and Denial of Application for Adjustment of Status filed by Muhammad).

17. Muhammad originally came to the U.S. as a student on an F-1 visa to study Business Administration with a concentration in accounting and finance at Colorado State University when he was 17 years old. He earned his bachelor's degree in business administration.

18. Thereafter, he changed status in the U.S. to E-2 (investment visa) to work with Enterprise Auto Sales, Inc.

19. In Muslim culture, it is expected that young adults enter into a marriage in-part arranged by the parents on both sides. Although they have a right of refusal, a match is generally accepted unless there is a strong objection.

20. After living some of his most formative years in the United States, Muhammad was not looking forward to the prospect of an arranged marriage. In fact, it was often the subject of fights with his parents that he was dating girls – a custom not accepted in Muslim tradition.

21. Once Muhammad was employed and out of school, his mother insistently pushed him to find a bride and start a family. As such, he agreed to meet with girls who his parents deemed good candidates for marriage as it was an expected duty of him.

22. His first match was with a Muslim girl from Dallas, whom he liked but his parents rejected the match after finding out that her parents were divorced. This goes to show the stigma that divorce carries in the Muslim community.

23. After the first match fell apart, Muhammad believed that he had contented his parents by showing interest in the prospect of marriage and family, but his father soon began persistently urging him to accept the matches his mother continued to set up. Although Muhammad believed his parents would never push him to enter into a match that he would object to, it soon became

evident that the undebatable expectation of him was to marry rapidly, which put him in a difficult situation as he had to consider his duties as a son before his desires as a man.

24. Out of respect for his parents, Muhammad agreed to meet Tayyaba Khan in Birmingham, Alabama. Their parents knew each other and Tayyaba's father was a revered university professor in Pakistan. The stakes were high for both families, and especially for Muhammad, as it had been his parents that reached out to Tayyaba's with a marriage prospect. Muhammad had much to prove to his potential family-in-law for the well-being of his own family's reputation

25. Muhammad's and Tayyaba's parents communicated for about six months before Tayyaba's parents decided to let Muhammad meet their daughter in Birmingham.

26. On October 9, 2020, Muhammad flew to Birmingham to meet Tayyaba and her family. At first, he met her parents and two sisters, and only after the family had gotten to know Muhammad did they allow Tayyaba to join them for dinner.

27. Muhammad got along with her family and considered Tayyaba very pretty, but thought she was remarkably shy for someone who he had heard was considered a top debate champion in Pakistan in high school.

28. Muhammad attributed her shyness to nervousness and the fact that both their families were present and at such a significant meeting. After all, he himself was accustomed to dating before meeting a family for a marriage proposal – as is most common in the United States – but Tayyaba was a very traditional Muslim young lady, and her custom was very reserved.

29. After the meeting, it was their families who decided to engage their children. Tayyaba's family then went to visit Muhammad's family in Pakistan on January 27, 2021 to meet her future family-in-law and celebrate the union. **EXHIBIT 5** (photos of when Tayyaba and her family visited Pakistan and Muhammad's family held a party at a golf course to celebrate Tayyaba and the

engagement. Muhammad's family presented Tayyaba with gifts including jewelry and an engagement ring). Muhammad could not attend this celebration because it was difficult for him to obtain a visa during COVID-19 and he might not have been able to return to the U.S.

**30.** After the official engagement, Muhammad and Tayyaba were permitted to have contact more often; however, when they began to speak on the phone and text frequently, Tayyaba's family cut their contact off and demanded that they have their Muslim marriage ceremony first, called Nikkah[2]. The Nikkah is a legal wedding ceremony under Islamic law, but conservative Muslims do not enable the parties to live in marital union or engage in physical intimacy until the Rukhsati[3].

**31.** On June 18, 2021, the couple engaged in a U.S. civil wedding, and their Nikkah was held on June 27, 2021, shortly thereafter. In a fraudulent marriage, there would not have been a need for them to sign a Muslim religious contract – the Nikkah, after all they were already civilly married. A Mehndi was celebrated on June 26, 2021, the day prior to the Nikkah. The Mehndi is the entertaining celebration of the wedding where the bride has her hands decorated with Henna[4] to symbolize joy, prosperity and blessings to the family. Families of both sides join in the celebration. **EXHIBIT 6** (photos of the Nikkah and the decorated hands of Tayyaba from the Mehndi ceremony, where Muhammad can be seen signing the Muslim marriage contract).

**32.** After the Nikkah, Muhammad returned to Miami, Florida where his job was. The couple started the planning for the Rukhsati – after which they would be permitted to live in marital union. **EXHIBIT 7** (exchanged group messages on WhatsApp regarding the planning of the Rukhsati and potential venues).

---

[2] https://www.theknot.com/content/nikkah-ceremony "The nikah ceremony is to unite a couple in marriage by professing and signing an agreement between the couple. It's officiated by an imam, a leader in the faith community, and joins the couple as spouses,"
[3] https://noblemarriage.com/blog/difference-between-nikah-and-rukhsati Rukhsati comes after the nikah. This event is the sending off of the bride, as she departs from her home for her husband's home. It tends to be an emotional moment and marks a shift in the bride's life as she becomes the responsibility of the husband.
[4] https://www.brides.com/mehndi-party-5075519

**33**. On October 3, 2021, Muhammad's brother had his Nikkah in Dallas, Texas. Tayyaba's mother and sisters attended. **EXHIBIT 8** (photos of Muhammad and Tayyaba at Muhammad's brother's Nikkah in Dallas).

**34.** On November 17, 2021[5], Tayyaba filed a Form I-130 (Immigrant Visa Petition) on behalf of Muhammad. **EXHIBIT 2** (Form I-130 submitted by Tayyaba and the related Form I-485 submitted by Muhammad. Undersigned counsel did not represent Muhammad and Tayyaba in their filings, therefore, no copies of the supporting documents related to those submissions are being presented herein, as Counsel only has access to the very same documents included in this exhibit. Nevertheless, USCIS has a complete record of the filings). USCIS, in relation to the Plaintiff's Immigrant Visa Petition, subsequently concluded that Muhammad misrepresented his address in his Application for Adjustment of Status by listing Tayyaba's address in Birmingham, Alabama as his residence as of June 18, 2021, the date of their civil marriage; however, the application also identified a Miami address, for which no dates of residence were provided. At the time, Muhammad was in a period of transition, as he was determining where he and Tayyaba would reside. He frequently traveled to Birmingham to visit Tayyaba, leading him to reasonably regard the Birmingham address as his most stable and appropriate permanent marital home. Moreover, the parties anticipated completing their Rukhsati ceremony in short order and planned to either reside temporarily with Tayyaba's parents until they had their own home, or for Tayyaba to follow Muhammad wherever his job took him, which could have been Miami. In light of this uncertainty and his ongoing travel between locations, Muhammad listed the Birmingham address as his primary residence but left the Miami address undated, symbolizing that it was also his "present" address without any date certain as to when it would end. It is not unusual for couples to

---

[5] Had Muhammad married for the purpose of evading the immigration laws, one would think he would have filed applications with USCIS immediately after the civil ceremony, rather than waiting five (5) months.

have two concurrent addresses due to job transfers, schooling, military service, illness of relatives or as here, the imminent completion of a customary, conservative, religious marriage.

35. In the meanwhile, Tayyaba was planning the Rukhsati and looking at venues for a big party. The couple were corresponding constantly about the plans for the Rukhsati, and Muhammad often stayed with Tayyaba's family in Birmingham. **EXHIBIT 7** (exchanged group messages on WhatsApp regarding the planning of the Rukhsati and potential venues. These were provided to USCIS at Muhammad's interview on April 22, 2026 related to the Immigrant Visa Petition filed by his wife, the Plaintiff, Alexandria). Interestingly, USCIS, in denying the visa petition filed by Alexandria, never mentioned any of the substantial documentation substantiating the bona fides of Muhammad's marriage to his first wife, Tayyaba (not evidence submitted by Tayyaba with her visa petition filed on Muhammad's behalf, not evidence submitted by Alexandria with her visa petition demonstrating the bona fides of Muhammad's marriage to Tayyaba).

36. The closer Muhammad became to Tayyaba, the less he was interested in her. He had assumed that her initial shyness was due to unfamiliarity and other cultural factors. However, even after the Nikkah, Tayyaba displayed no interests in common with Muhammad. She was not interested in a career, despite graduating college with a degree in health sciences with honors.

37. Muhammad never imagined marrying someone without any aspirations. Tayyaba only wanted to be a stay-at-home wife and mother and pursue no other prospects.

38. As time went by, after visiting Tayyaba many times and speaking with her daily through text messages and phone calls, Muhammad began to dread being with her. He found excuses to delay the Rukhsati. The frequency and depth of their communications during this period – which Muhammad described to USCIS at his April 22, 2026 interview and which are reflected in WhatsApp records submitted at said interview – directly contradict any inference that the marriage

9

was a sham or a paper arrangement. **EXHIBIT 9** (exchanged messages between Tayyaba and Muhammad after she found out he did not want the Rukhsati). USCIS never mentioned reviewing these records in its denial of Alexandria's visa petition.

39. Muhammad told his siblings that he didn't want to go through with the Rukhsati. Eventually, it became apparent to both of their parents that the Rukhsati was getting inordinately delayed.

40. Finally, Muhammad's brother told his parents that Muhammad did not want the Rukhsati.  His father was very disappointed. He told Muhammad that it would ruin Tayyaba's life and cause great shame on the families.

41. By July of 2022, it became very apparent to her family as well that he was unduly postponing the Rukhsati.

42. Starting in May of 2022, Muhammad let Tayyaba know that he was going through something and did not want to go through with the Rukhsati. She thought it was just a stage and didn't tell her parents as she didn't want to ruin his image in front them.  She was literally in shock and quite embarrassed. She was hurt and sent Muhammad many messages indicating her distress. **EXHIBIT 9** (exchanged messages between Tayyaba and Muhammad after she found out he did not want the Rukhsati).

43. While Muhammad was breaking it off with Tayyaba, he met Alexandria Scafidi, in late May of 2022. He had met her in passing a year or so earlier, but she had a boyfriend and he was with Tayyaba, so they weren't interested in each other at that time. A friend of Muhammad's invited her and her friends to their table, where Muhammad and Alexandria spoke much and found lots of things in common. It was a very different experience for him. Alexandria is a passionate Radiation Therapist who lost her mom to cancer when she was 16. Muhammad admired her commitment and purpose.

**44.** While his relationship with Tayyaba was falling apart, he started developing a relationship with Alexandria. Alexandria was fully aware of his situation with Tayyaba.

**45.** He wanted to end his relationship with Tayyaba in a manner that would cause the least damage to her reputation and standing in the Muslim community.

**46.** When Muhammad finally told Tayyaba's father that he did not want the Rukhsati, he and her mother were in shock. Her mother accused Muhammad of ruining her daughter's life, and condemned him that G-d would never forgive him. Muhammad suggested that they get an annulment so she could deny the existence of the marriage – which had never been consummated as the Rukhsati had not occurred – and so that her name would not be stained. If they had divorced, Muhammad believed that she would have been considered tainted.

**47.** The Board of Immigration Appeals, in the *Matter of P. Singh*, 27 I&N Dec. 598 (BIA 2019) held that evidence of marriage fraud must be "substantial and probative," meaning that the determination must involve consideration of all relevant evidence in its totality, and establish that it is "more than probably true that the marriage is fraudulent". *Singh* at 607.

**48.** It is abundantly clear, that there was insufficient evidence demonstrating that it was more than probable that the marriage between Muhammad and Tayyaba was entered into for the purpose of evading the immigration laws, 8 USC § 1154 (c).

**49.** The marriage between Muhammad and Tayyaba was arranged, but not for the purpose of evading the immigration laws. Similar to many religions, arranged marriages in the Muslim faith are often the custom. USCIS' determination that a religious arranged marriage is a "fraudulent" marriage is an affront to numerous religions.

**50.** The USCIS denial of Alexandria's visa petition cited the following reasons for determining the marriage was entered into for the purpose of evading the immigration laws: 1) The marriage

11

was arranged by Muhammad's parents, 2) The couple separated after the ceremony, never resided together, and did not consummate the marriage, 3) Muhammad started a relationship with Alexandria during his marriage to Tayyaba; and, lastly 4) That the beneficiary (Muhammad) represented that his address was in Alabama when he had not taken up residence with Tayyaba, constituting a "material misrepresentation."

51. Not once did USCIS address the religious significance of the different steps of the Muslim marriage, the substantial documentation of the bona fides of the marriage, and the observance of Muslim marriage customs, the plane tickets showing trips back and forth between Miami and Birmingham, the photos of the families celebrating the different marriage traditions, including the ones where her family visited his family in Pakistan,  or the emotional text messages when Muhammad advised Tayyaba that he could not go through with the Rukhsati.

52. Muhammad never attended any marriage interview with the I-130 filed on his behalf by Tayyaba. He abandoned his application for residence through Tayyaba. Had his primary motive for marrying Tayyaba been for the purpose of obtaining U.S. residence, why would he not have completed the Rukhsati? Why wouldn't he have just married an American girl and had a civil ceremony? Why involve the families? Why have her entire family travel to Pakistan? Why cause so much emotional turmoil knowing that Tayyaba's reputation in the Muslim community would be destroyed if he had consummated the marriage and later divorced her? It all makes no sense.

53. USCIS made much ado about the fact that the marriage was "arranged," taking a negative inference from this. It must be noted that many marriages are still arranged (Orthodox Jews, Muslims, Indians).[6]  USCIS made much ado about the fact that the marriage was not consummated.

---

[6] https://worldpopulationreview.com/country-rankings/arranged-marriage-countries *See also:*
https://pk.usembassy.gov/pause-on-immigrant-visa-issuances-for-pakistani-citizens/
https://www.chabad.org/library/article_cdo/aid/69429/jewish/Arranged-Marriages.htm

Under conservative Muslim law, it could not be until the Rukhsati. USCIS made much ado about Muhammad using the Alabama address as his home on his application for permanent residence, without mentioning that at the time of filing, the Rukhsati was imminent, and he would have been permitted to reside with his spouse in her home and that he also listed his Miami address without dates as he did not know when he would leave it. Lastly, USCIS made much ado about the fact that he started a relationship with his current wife, the Petitioner, in 2022, prior to his annulment. If philandering was the "tell" for whether a marriage is fraudulent, many of the leading business and political figures in America would be deemed to have engaged in a fraudulent marriage. In short, there is no substantial evidence that Muhammad's marriage to Tayyaba was for the purpose of evading the U.S. immigration laws. In fact, the converse is true. There is substantial and probative evidence that Muhammad's marriage to Tayyaba was bona fide.

54. It is no secret that the instant administration has policies banning Pakistanis and other Muslims from immigrating to the U.S. [7]

55. The denial of the visa petition filed by Alexandria (the Petitioner) has placed Muhammad in grave imminent danger of being taken into custody and detained without relief from removal. Muhammad's only relief from deportation would be to adjust status to lawful permanent resident. Due to the capricious nature of USCIS' decision denying Alexandria's Immigrant Visa Petition filed on Muhammad's behalf, Muhammad is no longer eligible to apply for adjustment of status to lawful permanent resident.  Immediately, upon denying the Immigrant Visa Petition, USCIS placed Muhammad in removal proceedings. Due to the denial of the visa petition filed by

---

[7] https://www.aclu-wa.org/timeline-muslim-ban/ *See also: https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html (over 1/3 of the world barred from immigrating to the U.S. noting that most of these countries are Muslim countries).*

Alexandria, Muhammad cannot seek relief from removal in the form of adjustment of status to lawful permanent resident in removal proceedings.

56. An Immigration Judge does have jurisdiction to reconsider the denial of an application for permanent residence in removal proceedings, but only if USCIS has already approved the visa petition. In the instant case, the arbitrary denial of the Petitioner's visa petition renders Muhammad subject to immediate detention and removal. [8] In fact, an immigration hearing has been scheduled for Muhammad on July 13, 2026 at 1:00 PM[9]. **EXHIBIT 10** (Muhammad's scheduling of removal proceedings hearing downloaded from the EOIR portal).

### LEGAL ARGUMENT

57. Given the extraordinarily harsh consequences of a fraud finding, the permanent separation of a United States citizen family, the law requires that the INS have "substantial and probative" evidence that the previous marriage was entered into for the purpose of evading the immigration laws. *See Matter of Tawfik*, Interim Dec. 3130 (BIA 1990). The burden is on USCIS to establish that the previous marriage was entered into for the purpose of evading the immigration laws. To meet its burden, the INS may not simply rely on a previous determination of fraud but must reach an independent conclusion based on concrete evidence in the alien's file. *Id.* Evidence that the couple no longer resided together, or even evidence from which fraud could be inferred, is not enough to support a denial of a subsequent visa petition. *Id.*

58. The USCIS has determined that Muhammad's marriage to Tayyaba was fraudulent because it was an arranged marriage, never consummated, the couple never lived together, and Muhammad started dating his current wife prior to the annulment of his marriage with Tayyaba. At no time did

---

[8] https://www.uscis.gov/i-130 *See also:*
https://www.uscis.gov/sites/default/files/document/forms/i-130instr.pdf
[9] Muhammad was never served with a Notice to Appear. He learned of the Removal Hearing by logging on to the EOIR Portal and inserting his Alien number, which gave him the date of his hearing.

14

USCIS address the customary and cultural nature of the Muslim marriage or the substantial evidence of the bona fides of the marriage, which were not only submitted in part with the Plaintiff's Immigrant Visa Petition, but that USCIS had access to through the filing of Tayyaba's I-130 petition. An affair and separation of parties after the inception of a marriage may be a good indication that a marriage has gone bad, but it is certainly not a clear indication that the marriage was a fraud at inception. A visa petition is properly approved if a marriage was bona fide at inception. *Matter of Laureano*, 19 I&N Dec. 1 (BIA 1983).

**59.** The denial of the visa petition filed by Alexandria on behalf of Muhammad due to his alleged fraudulent marriage to Tayyaba (his prior spouse), is not based upon substantial and probative evidence. It is a shallow, uneducated, culturally insensitive determination that is arbitrary, capricious and an abuse of discretion and an affront to all religious arranged marriages. Interestingly, the USCIS decision failed to mention any of the compelling evidence Muhammad presented demonstrating the bona fides of his marriage to Tayyaba.

## CLAIM FOR RELIEF

**60.** Plaintiff re-alleges and incorporates by reference paragraphs 1 through 59 above.

**61.** Defendants' decision in denying Plaintiff's non-discretionary visa petition due to the finding that her spouse had entered into a marriage for the purpose of evading the immigration laws is arbitrary, capricious, abuse of discretion and otherwise contrary to law.

**REQUEST FOR RELIEF**

WHEREFORE, Petitioner requests that the Court:

1.  Declare that the action of USCIS in denying Plaintiff's immigrant visa petition filed on behalf of her husband, Muhammad, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law-and-order.

2.  Award Petitioner reasonable costs and attorney's fees; and

3.  Award such further relief as the Court deems just and proper.

Date: May 7, 2026                          Respectfully submitted,


                                           /s/Tammy Fox-Isicoff
                                           Tammy Fox-Isicoff, Esq.
                                           FL Bar No. 371661
                                           tfox@rifkinfox.com
                                           RIFKIN & FOX-ISICOFF, P.A.
                                           1110 Brickell Avenue, Suite 600
                                           Miami, Florida 33131
                                           (305) 371-2777
                                           (305) 375-9517 (FAX)
                                           *Attorney for Plaintiff*

16

## <u>SERVICE LIST</u>

Tammy Fox-Isicoff, Esq.
<u>tfox@rifkinfox.com</u>
RIFKIN & FOX-ISICOFF, P.A.
1110 Brickell Avenue, Suite 600
Miami, Florida 33131
(305) 371-2777
(305) 375-9517 (FAX)
*Attorney for Plaintiff*

U.S. Attorney's Office Southern District of Florida
99 NE 4th Street
Miami, Florida 33132
(305) 961-9001
(305) 530-7679 (FAX)
*Attorney for Defendants*

17